**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

CINDY TRUDEAU,
                        Plaintiff,

     v.                                        No. 03-CV-583
                                                (DNH/DRH)

JO ANNE B. BARNHARDT, Commissioner
of Social Security,
                        Defendant.

---

**APPEARANCES:**                            **OF COUNSEL:**

MARK A. SCHNEIDER, ESQ.
Attorney for Plaintiff
57 Court Street
Plattsburgh, New York 12901

HON. GLENN T. SUDDABY              WILLIAM H. PEASE, ESQ.
United States Attorney for the          Assistant United States Attorney
   Northern District of New York
Attorney for Defendant
100 South Clinton Street
Syracuse, New York 13261-7198

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

Plaintiff Cindy Trudeau ("Trudeau") brought this action pursuant to 42 U.S.C. § 405(g) seeking review of a decision by the Commissioner of Social Security ("Commissioner") denying her application for benefits under the Social Security Act. Trudeau moves for a finding of disability and the Commissioner cross-moves for judgment on the pleadings. Docket Nos. 10, 11. For the reasons which follow, it is recommended that the Commissioner's decision be affirmed and Trudeau's motion for a finding of disability be

---

[1] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(d).

denied.

## I. Procedural History

On June 16, 1999, Trudeau filed an application for disability insurance benefits pursuant to the Social Security Act, 42 U.S.C. § 401 et seq. T. 125-27.[2] That application was denied after the initial determination and following reconsideration. T. 54-61. Trudeau requested a hearing before an administrative law judge (ALJ), T. 62, which was held before ALJ Joseph Gibbons on March 7, 2000. T. 21-51. Trudeau was represented by counsel. T. 21. In a decision dated June 19, 2000, the ALJ denied Trudeau's claims. T. 84. On September 28, 2001, the Appeals Council vacated the ALJ's decision. T. 83-86. On December 10, 2002, the ALJ conducted a remand hearing. T. 426 -55. (Docket No. 7). Trudeau was represented by counsel. T. 122. In a decision dated January 30, 2003, the ALJ denied Trudeau's claims. T. 9-18. On April 26, 2003, the Appeals Council denied Trudeau's request for review, thus making the ALJ's findings the final decision of the Commissioner. T. 4-6. This action followed.

## II. Contentions

Trudeau contends that the ALJ erred when he (1) failed properly to consider the opinion of her treating physician; (2) rejected her credibility; and (3) found that she retained the residual functional capacity to perform light work. The Commissioner contends that substantial evidence supports a finding that Trudeau was not disabled.

---

[2] "T." followed by a number refers to pages of the administrative transcript filed by the Commissioner. Docket Nos. 7, 8.

2

### III. Facts

Trudeau is currently forty-five years old, previously worked as a cook's helper and as a shipping and receiving clerk, and has completed the twelfth grade. T. 52, 135, 140, 429. Trudeau contends that she became disabled on May 19, 1997 due to double vision, left foot drop, and Raynaud's disease. T. 134.

### IV.  Standard of Review

#### A. Disability Criteria

A claimant seeking disability benefits must establish that "he [or she] is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A) (2002).  In addition, the claimant's impairments must be of such severity that he or she is not able to do previous work or any other substantial gainful work considering the claimant's  age, education, and work experience, regardless of whether such work exists in the immediate area, whether a specific job vacancy exists, or whether the claimant would be hired if he or she applied for work. 42 U.S.C. § 1382c(a)(3)(B) (2002).

The Commissioner uses a five-step process, set forth in 20 C.F.R. § 416.920, to evaluate SSI disability claims:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he [or she] is not, the [Commissioner] next considers whether the claimant has a 'severe impairment' which significantly limits his [or her] physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the

claimant has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a 'listed' impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he [or she] has the residual functional capacity to perform his [or her] past work. Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982); see 20 C.F.R. § 416.920 (2004).

The plaintiff has the burden of establishing disability at the first four steps. Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000). However, if the plaintiff establishes that an impairment prevents him or her from performing past work, the burden then shifts to the Commissioner to determine if there is other work which the claimant could perform. Id.

### B. Scope of Review

The reviewing court must determine if the commissioner has applied the proper legal standards and if the decision is supported by substantial evidence. Machadio v. Apfel, 276 F.3d 103, 108 (2d Cir. 2002). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Shaw, 221 F.3d at 131 (citations omitted). It must be "more than a mere scintilla" of evidence scattered throughout the administrative record. Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000). The ALJ must elaborate specific factors to allow the reviewing court to determine whether substantial evidence supports the decision. Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984). If the Commissioner's finding is supported by substantial evidence, it is conclusive and on review, the court cannot substitute its interpretation of the

4

administrative record for that of the Commissioner. Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998); Bush v. Shalala, 94 F.3d 40, 45 (2d Cir. 1996)

## V. Discussion

### A. Medical Evidence

On May 19, 1997, Trudeau presented to Dr. Kevin McCullum with complaints of dizziness and double vision. T. 205. There was normal visual acuity, normal ocular and neurological examinations, and no ocular movement disorder. T. 205. The assessment was left sixth cranial nerve palsy[3] leading to diplopia.[4] T. 205.  An MRI scan and blood tests were negative. T. 188, 204, 281-85.  Trudeau received an eye patch for comfort and was told to avoid work requiring significant depth perception. T. 204. Trudeau was also treated by Dr. Christopher Badger from May 1997 to May 2002 for complaints of double vision, frequent dizziness, headaches, anxiety, depression, and vertigo. 179-87, 191-201, 232-41, 321-28, 388-95. Trudeau was diagnosed with left sixth cranial nerve palsy, left foot drop,[5] and Raynaud's syndrome.[6]  T. 198-201. Trudeau was started on Tiazac, 240 mg for the Raynaud's syndrome. T. 201. A repeat MRI and blood tests in September 1998 were negative. T. 180-87. Trudeau received physical therapy in September 1998 with no change

---

[3] Cranial nerve palsy is "paralysis resulting from injury to or disease of one or more of the twelve cranial nerves." 2 SCHMIDT'S ATTORNEYS DICTIONARY OF MEDICINE 6567 (2004).

[4] "[T]he perception of two images of a single object; called also ambiopia, double vision, and binocular polyopia." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 475 (28th ed. 1994) [hereinafter DORLAND'S]..

[5] Footdrop is a "dropping of the foot from a peroneal or tibial nerve lesion that causes paralysis of the anterior muscles of the leg." DORLAND'S 648.

[6] "[I]ntermittent bilateral attacks of deficiencies in blood supply to the fingers or toes . . . and often accompanied by paresthesia and pain . . . [and] brought on characteristically by cold or emotional stimuli and relieved by heat." DORLAND'S 1276.

in her left ankle stability and she was unable to heel-walk with the right forefoot off the floor. T. 192-94. In August 1999, Dr. Badger placed Trudeau on Toprol and Prozac for migraine headaches. T. 236-37. Blood tests in November 2001 were normal. T. 328-29. There was a question as to whether Trudeau had multiple sclerosis (MS), but no definitive diagnosis was made. T. 324-26.

In August 1999, Dr. Todd Jorgensen opined that Trudeau's symptoms were consistent with an early presentation of MS, although her MRI was negative. T. 219. Trudeau was treated for complaints of diplopia and headaches at Fletcher Allen Health Care from May 18, 1997 to November 3, 1998. T. 251-58. Trudeau had 20/20 vision. T. 257. Trudeau was treated by Drs. Vilbert and Willie from May 1997 to September 1998 for complaints of diplopia and the diagnosis was again sixth cranial nerve palsy with an unclear etiology. T. 260-75. Dr. Robert Adler examined Trudeau on April 18, 2002 and concluded that Trudeau had diplopia on extreme left lateral gaze. T. 370-76.

### B. Treating Physician's Rule

Trudeau contends that the ALJ erred in the analysis and rejection of the opinion of her treating physician, Dr. Badger. When evaluating a claim seeking disability benefits, factors to be considered include objective medical facts, clinical findings, the treating physician's diagnoses, subjective evidence of disability, and pain related by the claimant . Harris v. Railroad Retirement Bd., 948 F.2d 123, 126 (2d Cir. 1991). Under the regulations, a treating source's opinion is entitled to controlling weight if well-supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with other substantial

6

evidence in the record. 20 C.F.R. § 404.1527(d)(2) (2004); Shaw v. Chater, 221 F.3d 126,134 (2d Cir. 2000). Before a treating physician's opinion can be discounted, the ALJ must provide "good reasons." Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998).

The ALJ is required to assess the following factors in determining how much weight to accord that opinion: (1) the frequency of examination, and the length, nature, and extent of the treatment relationship; (2) the evidence in support of the opinion; (3) the opinion's consistency with the record as a whole; (4) whether the opinion is from a specialist; and (5) other relevant factors. Schaal, 134 F.3d at 504. If other evidence in the record conflicts with the opinion of the treating physician, this opinion will not be deemed controlling or conclusive, and the less consistent is the opinion, the less weight it will be given. Snell v. Apfel, 177 F.3d 128, 134 (2d Cir.1999). Ultimately, the determination of disability and a claimant's inability to work rests with the Commissioner. 20 C.F.R. §§ 404.1527(e), 416.927(e) (2004).

Dr. Badger was Trudeau's treating physician from 1998 to 2002 and stated that Trudeau could not have worked between May 15, 1997 and September 17, 2001 as a result of her physical impairments, particularly her migraine headaches. T. 394. The ALJ carefully considered Dr. Badger's opinion but found that during the period in question, Trudeau was not totally disabled and that Dr. Badger's opinion was not entitled to controlling weight in light of the other substantial conflicting evidence in the record. T. 14. The ALJ pointed to the opinions of other physicians, the objective clinical findings, and Trudeau's daily activities as specific reasons for rejecting Dr. Badger's opinion. T. 14. According to Dr. Badger, the diplopia continued because Trudeau could not afford glasses needed to correct her double vision. T. 392. Trudeau's neurological symptoms were stable, her MRI scans and blood

work were normal, her vision was 20/20, and she had normal visual acuity and normal ocular examinations. T. 180-87, 204-05, 257.

The opinions of other physicians are not consistent with Dr. Badger's opinion. Dr. McCullum allowed Trudeau to work in May 1997 but advised her to avoid activities requiring significant depth perception, working at heights, and working near dangerous or rapidly moving machinery. T. 204.  On April 18, 2002,  Dr. Robert Adler stated that Trudeau could perform all activities without restrictions. T. 370-71. A non-examining physician placed no restrictions on Trudeau other than activities requiring fine depth perception. T. 331-41. Dr. Duncan, a non-examining physician, stated that Trudeau had transient variable left eye muscle weakness, occasional double vision, and all other findings were normal. T. 380-82. Trudeau was not prevented from working. T. 380-82. Dr. Vilbert stated that Trudeau could return to work but should avoid activities requiring significant depth perception. T. 204-05. No other physician concluded that Trudeau was disabled due to any of her impairments regardless of the diagnosis of migraine headaches, sixth cranial nerve palsy, or footdrop.

Therefore, the ALJ's analysis, findings, and conclusions regarding Trudeau's treating physician's opinion were supported by substantial evidence and the Commissioner's finding in this regard should be affirmed.

### C. Credibility

Trudeau contends that the ALJ erred as a matter of law in rejecting her credibility. The basis for establishing disability includes subjective symptoms even where the symptoms are unsupported by clinical or medical findings, provided that the underlying impairment can be "medically ascertained." 20 CF.R. § 404.1529 (2003); Snell v. Apfel, 177

F.3d 128, 134 (2d Cir. 1999). An ALJ must consider all symptoms, including pain, and the extent to which these symptoms are consistent with the medical and other evidence. 20 C.F.R. § 404.1529 (2003); Martone v. Apfel, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (Hurd, J.). Pain is a subjective concept "difficult to prove, yet equally difficult to disprove" and courts should be reluctant to constrain the Commissioner's ability to evaluate pain. Dumas v. Schweiker, 712 F.2d 1545, 1552 (2d Cir. 1983).

It is the function of the Commissioner to assess the credibility of witnesses. Saviano v. Chater, 956 F. Supp. 1061, 1071 (E.D.N.Y. 1997). The claimant's credibility and motivation as well as the medical evidence of impairment are used to evaluate the true extent of the alleged symptoms and pain, and the degree to which it hampers the claimant's ability to engage in substantial gainful employment. See Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1978); Lewis v. Apfel, 62 F. Supp. 2d 648, 653 (N.D.N.Y. 1999) (Kahn, J). The ALJ must consider several factors pursuant to 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3):

> (i)  [The claimant's] daily activities;
>
> (ii)  The location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;
>
> (iii) Precipitating and aggravating factors;
>
> (iv)  The type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms;
>
> (v) Treatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of . . . pain or other symptoms;
>
> (vi) Any measures [the claimant] use[s] or ha[s] used to relieve . . . pain or other symptoms (e.g., lying flat on [his] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

>> vii) Other factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (2003).

Here, the ALJ stated that he considered Trudeau's testimony and found that the medical evidence did not support her claims of frequent double vision. T. 16. This rejection of Trudeau's symptoms is supported by substantial evidence in the record. There was a normal neurological and ocular examination by Dr. McCullum. T. 204. Double vision was noted only at a distance, only in the left eye, and only on extreme gaze. Dr. Edinger reported that Trudeau was much improved in February and September, 1998. T. 253, 261. Fletcher Allen reported that Trudeau felt her diplopia had decreased. T. 254. Trudeau reported her double vision had subsided in August, and November, 1997. T. 265, 267 .While Dr. Badger stated that Trudeau might benefit from prescription glasses, she did not follow up with the ophthalmologist.  T. 324. Trudeau was not taking any prescription medication.  Trudeau had a stable neurological examination and experienced diplopia only after reading for a period of time. T. 324.  There was no neurological disorder, MRI and blood tests were unremarkable, and there was no permanent eye disorder or problems noted. T. 341.  Trudeau had 20/20 vision in both eyes. T. 174, 265.

Trudeau helped care for one acre of  property where she lived with her husband and stepson, owned and cares for three horses, shared grocery shopping, housecleaning, cooking, and laundry with her husband, was able to care for her personal needs and manage bank accounts, did light gardening, visited family members occasionally, and could drive short distances. T. 27-40, 155. Trudeau stated that she could complete certain activities provided she was able to stop every hour and rest her eyes for ten to fifteen

10

minutes and that she was not limited in the amount she could read. T. 27-32, 36, 288. Trudeau noted that her left sided headaches could be alleviated with over-the-counter medications and rest. T. 27-28, 32, 35. Here, the only support for Trudeau's symptoms were her own subjective testimony and there is a lack of objective clinical findings.

The ALJ's finding regarding Trudeau's credibility was supported by substantial evidence. Therefore, it is recommended that the Commissioner's finding in this regard be affirmed.

### D. Residual Functional Capacity

Residual Functional Capacity (RFC) describes what a claimant is capable of doing despite his or her impairments. 20 C.F.R. § 404.1545(a) (2002). "RFC is determined by considering all relevant evidence consisting of, inter alia, [the claimant's] physical abilities [and] symptoms including pain . . . [and other] limitations which go beyond symptoms." Martone, 70 F. Supp. 2d at 150 (citing 20 C.F.R. §§ 404.1545, 416.945 (1991)). "RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations." Smith v. Apfel, 69 F. Supp. 2d 370, 378 (N.D.N.Y. 1999) (Hurd, J.) (citing LaPorta v. Bowen, 737 F. Supp. 180, 183 (N.D.N.Y. 1990) (McAvoy, J.)). In assessing RFC, the ALJ must make findings specifying what functions the claimant is capable of performing, not simply making conclusory statements regarding the claimant's capabilities. Martone, 70 F. Supp. 2d at 150. RFC is then used to determine whether the claimant can perform his or her past relevant work or other work in the national economy. State of N.Y. v. Sullivan, 906 F.2d 910, 913 (2d Cir. 1990); see generally 20 C.F.R. §§ 404.1520 (2002), 416.960 (2002).

The ALJ found that Trudeau had the RFC to perform light work, such as

cashier/counter work, general office work, assembler, and kitchen helper and that these jobs existed in significant numbers in the local and national economies. T. 17.  Light work is defined as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 416.967(b).  Trudeau retained the RFC to perform simple, entry-level, light work where vision was not an essential element. Trudeau went back to work on September 17, 2001. T. 44.  This conclusion is supported by substantial evidence in the record. T. 195-211, 218-19, 331-41, 364-77, 380-87, 396 -422.

In compliance with the Appeals Council order, the ALJ obtained the opinion of a medical expert, Dr. Willer, who stated that Trudeau's limitations were only activities that required three dimensional perception and there were no further limitations on postural or exertional activities. T.  364-68.  Dr. Willer added that no diagnosis had been properly developed and additional tests could have confirmed any serious problem. T. 364-68.  A non-examining consultant found that Trudeau had no exertional limitations, her  depth perception was affected, and would interfere with an occupation such as a jeweler, and he questioned the diagnosis of sixth cranial nerve palsy and left foot drop. T.  331-41.

A second non-examining consultant, Dr. Duncan, found that  Trudeau had normal eyes except for the presence of variable left eye muscle weakness.  Trudeau did not meet the  criteria for disability and her  impairments did not preclude Trudeau from working. T. 380-87.  Dr. Duncan limited Trudeau's postural activities but there were no visual or communicative limitations. T. 382-86. A physical RFC assessment found that Trudeau

12

could occasionally lift or carry ten pounds, frequently lift ten pounds, stand or walk at least two hours, sit for six hours, she could never climb or balance but could occasionally stoop. kneel, crouch, and crawl, she had no manipulative limitations, and she was limited in near acuity and far acuity secondary to diplopia. T. 221-29.

A vocational expert testified that considering Trudeau's age, education, and past work experience, jobs existed in significant numbers in the national economy that Trudeau could perform. T. 449. These included a clerk and general office work of which there were 500 jobs in the greater Glens Falls area and more than 1.5 million nationally. T. 449. The vocational expert testified that if the double vision and the headaches were on a daily basis, any type of work would be precluded. T. 452. Here, the ALJ rejected Trudeau's testimony regarding her headaches and double vision. See subsection C supra.

The ALJ's determination of Trudeau's RFC was supported by substantial evidence and should be affirmed.

## VI. Conclusion

For the reasons stated above, it is hereby

**RECOMMENDED** that the decision denying disability benefits be **AFFIRMED**, and Trudeau's motion for a finding of disability be **DENIED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F.2d 85 (2d Cir. 1993) (citing

Small v. Secretary of HHS, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


DATED: January 24, 2005
         Albany, New York

*/s/ David R. Homer*
United States Magistrate Judge